Slip Op. 14-102

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
PAPIERFABRIK AUGUST KOEHLER SE,  :
                                 :
          Plaintiff,             :
                                 :
                                 :  Before: Nicholas Tsoucalas
     v.                          :          Senior Judge
                                 :
UNITED STATES,                   :  Court No.: 13-00163
                                 :
          Defendant,             :
                                 :  PUBLIC VERSION
          and                    :
                                 :
APPLETON PAPERS INC.,            :
                                 :
          Defendant-Intervenor.  :
_____
```

### OPINION

[Plaintiff's motion for judgment on the agency record is denied.]

Dated:September 3, 2014

F. Amanda DeBusk, Matthew R. Nicely, John F. Wood, Eric S. Parnes, Lynn G. Kamarck, and Alexandra B. Hess, Hughes Hubbard & Reed LLP, of Washington, DC, for plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Jessica M. Forton, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Daniel L. Schneiderman and Gilbert B. Kaplan, King & Spalding LLP, of Washington, DC, for defendant-intervenor.

**Tsoucalas, Senior Judge:** Plaintiff Papierfabrik August Koehler SE ("Koehler") moves for judgment on the agency record contesting the determination of the U.S. Department of Commerce ("Commerce") in Lightweight Thermal Paper From Germany: Final Results of Antidumping Duty Administrative Review; 2010-2011, 78 Fed. Reg. 23,220 (Apr. 18, 2013) ("Final Results"). Commerce and defendant-intervenor Appvion, Inc. ("Appvion"),[1] oppose Koehler's motion. For the following reasons, Koehler's motion is denied.

### BACKGROUND

Commerce initiated the third administrative review ("AR3") of lightweight thermal paper ("LWTP") from Germany in December 2011. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 76 Fed. Reg. 82,268, 82,269 (Dec. 30, 2011). At the onset, Commerce requested data on Koehler's home market sales, U.S. sales, and costs. Sales Questionnaire (Jan. 6, 2012), Public Rec.[2] 9-12.

Koehler provided timely responses to Commerce's questionnaire and certified to the accuracy and completeness of its responses. See Koehler Resp. § A Questionnaire (Feb. 21, 2012), CR 2-4; Koehler Resp. §§ B&C Questionnaire (Feb. 27, 2012),

---

[1] In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc. See Letter to Clerk of the Court, ECF No. 25 (June 21, 2013).

[2] Hereinafter, documents in the public record will be designated "PR" and documents in the confidential record will be designated "CR" without further specification except where relevant.

CR 5-14.   On May 16, 2012, Commerce issued a supplemental questionnaire requesting that Koehler clarify certain responses. See First Supplemental Questionnaire (May 16, 2012), CR 47.

On May 18, 2012, the last day to submit new factual information, Appvion submitted an affidavit from a confidential source regarding Koehler's home market sales.  See Submission of New Factual Information at 2-3 & Exh. 1 (May 18, 2012), CR 49 ("May 18th Letter").  Although Appvion withheld certain information from disclosure, it provided a public summary in which it alleged that Koehler "engaged in a scheme to defraud [Commerce] by intentionally concealing certain otherwise reportable home market transactions." Id. at 2.  Specifically, Appvion claimed that Koehler was "selling 48 gram thermal paper that it knows is destined for consumption in Germany through various intermediaries in third-countries."  Id. at 2-3.   Appvion further alleged that Koehler undertook this transshipment scheme "to artificially manipulate prices attributable to those sales of 48 gram paper shipped directly to its German customers."  Id. at 3.

Koehler initially denied the allegations, and objected to Appvion's bracketing[3] of certain information in its submission. See Objections of Koehler to Over-Bracketing of Petitioner's May

---

[3] Single-bracketed information is confidential information that is disclosed in accordance with an administrative protective order. Double-bracketed information is confidential information that is exempt from disclosure under an administrative protective order.

18 New Fictional Information Letter at 1-8 (May 23, 2012), PR 92. Commerce requested that Appvion provide further justification for its bracketing of certain information, see Letter to Appvion re: Submission of New Factual Information at 1 (June 1, 2012), PR 98, but did not require disclosure. Koehler also requested an extension of time to submit its supplemental questionnaire response ("SQR") and respond to Appvion's allegations, Request for Add'l Extension of Deadline for Submission of First SQR at 1-2 (June 4, 2012), PR 99, which Commerce granted in part. See Second Request for Extension of SQR at 1 (June 5, 2012), PR 100.

      In its SQR, Koehler admitted that "certain sales of 48-gram [LWTP], which were shipped to a third country, were ultimately delivered to customers in the German market, and should have been reported by Koehler as home market transactions."[4]  SQR at 1 (June 27, 2012), CR 66.  It described the nature of the transshipment arrangements:  Koehler shipped merchandise to intermediaries outside of Germany [[

                          ]]; the intermediaries [[

                          ]] shipped it directly to the customer in Germany.  Id. at 2-3.  According to Koehler, "[t]he impact of this shipping arrangement was to [[

---

[4] Although Koehler initially bracketed the majority of its admission as confidential information, certain statements were discussed publicly during AR3 and in the briefs.

]].” Id. at 2. It further explained that it made these arrangements in order to make home market sales “[[

]].” Id. at 3. Despite this admission, Koehler claimed that “these acts and omissions were undertaken without the authority or knowledge of the Chief Executive Officer, the Chief Financial Officer, the in-house counsel, or the Board of Directors of Koehler.” Id. at 1.

Koehler also submitted new home market sales data including the transshipped sales it omitted from its initial questionnaire response. Id., Exh. S1-27. Commerce rejected this data as “untimely filed factual information that was not solicited” in the supplemental questionnaire. Rejection of Factual Information Submission Filed by Koehler at 1 (July 5, 2012), PR 108. Koehler subsequently refiled its SQR without the transshipped sales data. Resubmission of Portion of SQR (Aug. 2, 2012), CR 90.

Commerce issued its preliminary determination in December 2012. LWTP From Germany; Preliminary Results of Antidumping Duty Administrative Review; 2010-2011, 77 Fed. Reg. 73,615 (Dec. 11, 2012) (“Preliminary Results”). Because Koehler transshipped certain home market sales and then omitted those sales from its initial questionnaire responses, Commerce preliminarily

applied total adverse facts available ("AFA").  <u>See</u> Preliminary
Results of Antidumping Duty Administrative Review: Application of
Total AFA to Koehler at 1, 11-16 (Dec. 3, 2012), CR 99.  It selected
the petition rate of 75.36% as the AFA rate.  <u>Id.</u> at 17.  In its
final determination, Commerce upheld the <u>Preliminary Results</u> in
their entirety.  <u>See Issues and Decision Memorandum for the Final</u>
<u>Results of the 2010-2011 Administrative Review on LWTP from Germany</u>
at 1 (Apr. 11, 2013), PR 176.

### JURISDICTION and STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. §
1581(c) (2012) and section 516A(a)(2)(B)(iii) of the Tariff Act of
1930,[5] as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).

The Court will uphold Commerce's determination unless it
is "unsupported by substantial evidence on the record, or otherwise
not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).
Substantial evidence "means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion." <u>Universal</u>
<u>Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951).

### DISCUSSION

Koehler contests several aspects of the <u>Final Results</u>,
including: Commerce's decision to reject its corrected sales data
and apply AFA; Commerce's decision to apply total AFA; and

---

[5] Further citations to the Tariff Act of 1930 are to the relevant
portions of Title 19 of the U.S. Code, 2012 edition.

Commerce's selection of the petition rate as Koehler's AFA rate.
See Pl.'s Mem. Supp. R. 56.2 Mot. J. Agency R. at 12-15 ("Pl.'s
Mem."). Because the Final Results were supported by substantial
evidence and consistent with law, Koehler's motion must be denied.

## I. Legal Framework for Application of AFA

Commerce may rely on facts otherwise available where
"necessary information is not available on the record" or a party
"withholds information that has been requested by [Commerce],"
"fails to provide such information by the deadlines for submission
of the information or in the form and manner requested,"
"significantly impedes a proceeding," or provides information that
"cannot be verified." 19 U.S.C. § 1677e(a).

Where a submission is deficient, Commerce "shall
promptly inform the person submitting the response of the nature
of the deficiency and shall, to the extent practicable, provide
that person with an opportunity to remedy or explain the deficiency
in light of the time limits." Id. § 1677m(d). If the response is
unsatisfactory or untimely, Commerce may "disregard all or part of
the original and subsequent responses." Id.

Notwithstanding a partial deficiency, Commerce "shall
not decline to consider" necessary information if (1) "the
information is submitted by the deadline established for its
submission," (2) "the information can be verified," (3) "the
information is not so incomplete that it cannot serve as a reliable

basis for reaching the applicable determination," (4) "the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information," and (5) "the information can be used without undue difficulties." Id. § 1677m(e). The submission must satisfy all five conditions. Id.

Commerce may make an adverse inference in selecting from amongst the facts available if the respondent "fail[s] to cooperate by not acting to the best of its ability to comply with a request for information." Id. § 1677e(b). Commerce may use information from the petition, the investigation, a prior administrative review, or other information on the record. Id. When relying on secondary information, Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." Id. § 1677e(c).

## II. Commerce's decision to apply AFA was supported by substantial evidence and consistent with law.

Commerce applied AFA because Koehler failed to cooperate to the best of its ability with its request for complete and accurate home market sales data. See CR 99 at 13–16. Koehler argues that Commerce's decision to apply AFA was erroneous because Commerce ignored certain "key facts" demonstrating that it cooperated with the review and because Commerce improperly rejected the corrected home market sales data that would have

enabled Commerce to calculate an accurate dumping margin.  See
Pl.'s Mem. at 16-37.  Because Commerce's decision to apply AFA was
reasonable, the court rejects both of these arguments.

### A. Koehler did not cooperate to the best of its ability with Commerce's request for home market sales data.

As noted above, Commerce may apply AFA where "an
interested party has failed to cooperate by not acting to the best
of its ability to comply with a request for information."  19
U.S.C. § 1677e(b).  "Compliance with the 'best of its ability'
standard is determined by assessing whether the respondent has put
forth its maximum effort to provide Commerce with full and complete
answers" to a request for information.  Nippon Steel Corp. v.
United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Here, Koehler's admissions provided Commerce with
evidence of its failure to cooperate.  Koehler concealed the German
destination of certain sales by transshipping merchandise through
intermediaries outside of Germany.  See SQR at 1-4.  It arranged
the transshipments so as to make home market sales at prices that
would have resulted in the dumping of its U.S. sales.  See id. at
3.  And, when Commerce requested that Koehler provide complete and
accurate home market sales data, Koehler omitted these sales from
its response.  Id. at 1.  Koehler did not attempt to provide a
full reporting of its home market sales until Appvion produced
evidence of the transshipments.  See CR 49; SQR, Exh. S1-27.  At

a minimum, this evidence demonstrates that Koehler did not "put forth its maximum effort to provide Commerce with full and complete answers" to a request for information. <u>Nippon</u>, 337 F.3d at 1382.

Despite its admissions, Koehler contends that Commerce's conclusion was erroneous. <u>See</u> Pl.'s Mem. at 16–22, 36–37. According to Koehler, "rogue employees" arranged the transshipments without the knowledge or consent of their "supervisors" or Koehler's "senior management." <u>Id.</u> at 17. Insisting that its "senior management" did not discover the transshipments until after the May 18th Letter, Koehler essentially claims that its omissions were inadvertent. <u>Id.</u> at 18–19. Koehler argues that it fully cooperated after this discovery, investigating its home market sales reporting, disciplining responsible employees, safeguarding against future misconduct, and submitting complete home market sales data. <u>Id.</u> at 19–21. Koehler claims that Commerce disregarded this evidence and thus erroneously imposed AFA. <u>Id.</u> at 22. Koehler also argues that, at the very least, Commerce should have considered these facts as mitigating evidence, as other government agencies might in their proceedings. <u>See</u> <u>id.</u> at 19 n.3, 22. This alternative interpretation of the record, however, is neither legally nor factually sufficient to warrant overturning Commerce's decision.

First, Koehler's argument that "supervisors" and "senior management" were unaware of the transshipments is not supported by

the record.   The sole basis for this argument is Koehler's own statement that its Chief Executive Officer, Chief Financial Officer, in-house counsel, and directors were unaware of the transshipments.   <u>See</u> SQR at 1.   However, Koehler did not provide Commerce with any evidence supporting this claim during the review, and its attempt to extend this claim to the vaguely-titled "supervisors" and "senior management" is similarly undocumented. <u>Id.</u>   In fact, Koehler admitted that [[

]].   <u>See</u> <u>id.</u> at 4-5 ("[[


]].").

Regardless, the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping."   <u>Nippon</u>, 337 F.3d at 1382.   Koehler was an "interested party" to the review.   <u>See</u> 19 U.S.C. § 1677(9) (defining an interested party as "a foreign manufacturer, producer, or exporter . . . of subject merchandise . . . .").   As such, Koehler was required to "have familiarity with all of the records it maintains" and "conduct prompt, careful, and comprehensive investigations of all relevant records."   <u>Nippon</u>, 337 F.3d at 1382.   Accordingly, Commerce reasonably concluded that "Koehler [was] responsible for the actions of its entire company, especially any actions that may have an effect on its reporting to [Commerce]."   CR 99 at 14.

Furthermore, Koehler's remedial efforts did not reestablish its cooperation with the review.  As Commerce noted, Koehler began these efforts only <u>after</u> it was confronted with allegations of misconduct.  <u>Id.</u> at 15.  Commerce reasonably concluded that these efforts failed to "restore [its] confidence in the reliability of [Koehler's] home market sales data."  <u>Id.</u> at 16; <u>see</u> <u>Tianjin Magnesium Int'l Co. v. United States</u>, 36 CIT __, __, 844 F. Supp. 2d 1342, 1348 (2012) (Tsoucalas, J.) (Commerce's argument that, "other than the established fabrications," the respondent fully cooperated was inconsistent with the purpose of AFA).  And, Koehler fails to identify any authority requiring Commerce to consider these actions as a mitigating factor in its determination.[6]  In light of Koehler's conduct, Commerce reasonably determined that Koehler failed to cooperate to the best of its ability.  <u>See</u> <u>Nippon Steel</u>, 337 F.3d at 1382.

**B. Commerce's decision to reject Koehler's untimely submission of the previously unreported home market sales data was proper.**

Koehler also argues that Commerce's decision to apply AFA was wrongful because it provided Commerce with the initially unreported data.  Pl.'s Mem. at 22–23.  According to Koehler,

---

[6] Commerce insists that the court should not address this argument because Koehler did not raise it at the administrative level.  <u>See</u> Def.'s Mem. Opp'n Pl.'s R. 56.2 Mot. J. Agency R. at 37.  Because there is no authority supporting Koehler's argument, the court does not need to address this exhaustion claim.

Commerce was required to accept and utilize this data, and its decision to reject the data violated 19 U.S.C. § 1677m(d) and (e). See id. at 23-35.  Koehler also argues that this decision was arbitrary and an abuse of discretion.  Id. at 25, 26-29.

Koehler submitted the corrected data along with its SQR on June 27, 2012, well after the deadlines for home market sales information and new factual information expired.  See SQR, Exh. S1-27 (June 27, 2012).  Although Koehler claims that Commerce indicated that it would accept this data when granting Koehler's extension request, Commerce did not make any such representation. See PR 100 at 1 (partially granting Koehler's request for an extension of time to reply to the supplemental questionnaire). Koehler's submission of its home market sales data was untimely because, as noted above, it failed to cooperate with Commerce's initial request for that data.  Although Koehler claims that Commerce's sole reason for rejecting the data was timeliness, Commerce found that Koehler did not cooperate during the review. See CR 99 at 11; PR 176 at 12.  Because Koehler's submission did not satisfy all five conditions of section 1677m(e), Commerce was not obligated to accept it.[7]  See 19 U.S.C. § 1677m(e).

---

[7] Koehler argues that Commerce erroneously determined that its sales data was unverifiable because Commerce subsequently verified Koehler's sales data, including transshipped sales, during the fourth administrative review ("AR4").  See Notice of Supplemental Authority at 1-2 (July 9, 2014), ECF No. 113.  However, because Koehler cooperated during AR4, providing Commerce with timely and

For similar reasons, Commerce was not required to accept Koehler's submission under 19 U.S.C. § 1677m(d).  This Court has held that the "remedial provisions" of section 1677m(d) "are not triggered unless the respondent has met <u>all</u> of the five enumerated criteria" of section 1677m(e).  <u>Tung Mung Dev. Co. v. United States</u>, 25 CIT 752, 789 (2001).  Regardless, Commerce provided Koehler with an opportunity to explain the omissions from its initial questionnaire responses.  <u>See</u> SQR at 1–5; 19 U.S.C. § 1677m(d) (directing Commerce to provide a party "with an opportunity to remedy or explain the deficiency").  As noted above, this explanation served as the basis for Commerce's AFA decision.

And, Commerce's decision was not an abuse of discretion, as Koehler claims.  Citing <u>NTN Bearing Corp. v. United States</u>, and <u>Timken U.S. Corp. v. United States</u>, Koehler argues that Commerce abused its discretion because it had ample time to analyze and use the correct data during the review.  <u>See</u> Pl.'s Mem. at 27. "Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits."  <u>Yantai Timken Co. v. United States</u>, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1370 (2007).  Although

---

complete home market sales data, the facts of AR4 differ from the instant case.  <u>See</u> <u>Issues and Decision Memorandum for the 2011-2012 Final Results of the Administrative Review on LWTP from Germany</u> at 15 (June 11, 2014).  Regardless, Koehler's submission did not satisfy section 1677m(e).

the cases Koehler cites limit Commerce's discretion to reject untimely corrective submissions prior to the final results stage, they are inapplicable here because they do not involve a failure to cooperate. Timken U.S., 434 F.3d 1345, 1352-54 (Fed. Cir. 2006); NTN Bearing, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995). Commerce's decision here was proper given Koehler's failure to cooperate. Yantai Timken, 31 CIT at 1755, 521 F. Supp. 2d at 1370.

        Finally, Koehler insists that Commerce arbitrarily enforced the deadline for new factual information because it subsequently accepted Appvion's July 9, 2012 submission. Pl.'s Mem. at 25. This is simply incorrect. An interested party may "submit factual information to rebut, clarify, or correct factual information" in a supplemental questionnaire response within ten days of that response. 19 C.F.R. § 351.301(c)(1)(v) (2012). Appvion's submission was a timely rebuttal of the SQR, therefore Commerce properly accepted that information. Id.

        Ultimately, the court finds no reason to overturn Commerce's decision to apply AFA.

### III. Commerce reasonably applied total AFA.

        Next, Koehler argues that even if AFA was appropriate, application of total AFA was not. See Pl.'s Mem at 37. Koehler contends that its conduct affected only a discrete amount of sales and Commerce erroneously ignored the home market sales, U.S. sales, and costs data that Koehler properly submitted. See id. at 39-

40.   According to Koehler, Commerce had no basis to apply total AFA because it could still calculate an accurate margin.   Id.   It insists that Commerce could have used the properly submitted data to calculate the dumping margin, while using sales data for products similar to the transshipped merchandise to fill the gap in the record.   Id. at 42.   Koehler adds that in prior cases where fraudulent conduct justified the application of total AFA, the respondent's conduct was far more egregious than its own.   See Pl.'s Reply Br. at 5-8.

        The term total AFA is not defined by statute.   Commerce uses the term "total AFA" to refer to the "application of [AFA] not only to the facts pertaining to specific sales for which information was not provided, but to the facts respecting all of respondents' sales encompassed by the relevant antidumping duty order."   Shandong Huarong Mach. Co. v. United States, 30 CIT 1269, 1271 n.2, 435 F. Supp. 2d 1261, 1265 n.2 (2006).   Accordingly, total AFA is appropriate "where none of the reported data is reliable or usable."   Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).   Additionally, the Court has found Commerce's reliance upon total AFA proper where missing information was "core, not tangential."   Since Hardware (Guangzhou) Co. v. United States, 34 CIT __, __, Slip Op. 10-108 at 21 (Sept. 27, 2010) (citing Shanghai Taoen Int'l Trading Co. v. United States, 29 CIT 189, 199 n.13, 360 F. Supp. 2d. 1339, 1348

n.13 (2005)).  In contrast, Commerce properly relies on partial AFA where the deficiency is only "with respect to a discrete category of information."  Foshan Shunde Yongjian Housewares & Hardware Co. v. United States, 35 CIT __, __, Slip Op. 11-123 at 33 (Oct. 12, 2011).

As noted above, Commerce may not discard information if it satisfies the five enumerated conditions of section 1677m(e). See 19 U.S.C. § 1677m(e).  However, this Court previously found it reasonable for Commerce to interpret the term "information" in section 1677m(e) to encompass "all the information submitted by an interested party."  Steel Auth. of India v. United States, 25 CIT 482, 486, 149 F. Supp. 2d 921, 928 (2001); see Mukand, Ltd. v. United States, 38 CIT __, __, Slip Op. 13-41 at 13 (Mar. 25, 2013) (acknowledging that Commerce's interpretation of "information" is reasonable).  The Court recognized that "if [Commerce] were forced to use the partial information submitted by respondents, interested parties would be able to manipulate the process by submitting only beneficial information."  Steel Auth., 25 CIT at 487, 149 F. Supp. 2d at 928.  And, as a result, "[r]espondents, not [Commerce], would have the ultimate control to determine what information would be used for the margin calculation[,]" which would be "in direct contradiction to the policy behind the use of facts available."  Id., 149 F. Supp. 2d at 928.

Here, Commerce applied total AFA because Koehler's
conduct "undermin[ed] the credibility and reliability of Koehler's
data overall," and "significantly imped[ed] [Commerce]'s ability
to conduct the instant review." CR 99 at 12. It found that
Koehler's failure to report the transshipped sales was a "material
omission" that prevented Commerce from "rely[ing] upon any of
Koehler's submitted information to calculate an accurate dumping
margin." Id. Without reliable sales data, Commerce determined
that it could not calculate the normal value and was "unable to
perform any comparisons to U.S. prices." Id. at 13. Accordingly,
Commerce concluded that total AFA, rather than partial AFA, was
appropriate. Id.

Commerce's decision to apply total AFA was reasonable.
This was not, as Koehler suggests, a case where the respondent's
conduct affected only a discrete category of information. Cf.
Gerber Food (Yunnan) Co. v. United States, 29 CIT 753, 764–67, 387
F. Supp. 2d 1270, 1281–83 (2005) (total AFA was inappropriate where
respondent's failure to disclose its export agency arrangement did
not affect the data necessary to calculate the dumping margin).
Koehler views its conduct too narrowly. Here, Koehler manipulated
its sales data by concealing certain home market sales detrimental
to its dumping margin. See SQR at 1–4. The effects of this
conduct extended beyond the omitted sales because Commerce could
not make the comparisons between the normal value and U.S. prices

necessary for calculating the dumping margin. See Steel Auth., 25 CIT at 486, 149 F. Supp. 2d at 927 (recognizing that accurate home market sales, U.S. sales, costs, and constructed value data are "necessary" to the dumping margin calculation). Because Koehler's sales data was incomplete and unreliable, Commerce reasonably concluded that it could not calculate the dumping margin using this data. See Mukand, 37 CIT at __, Slip Op. 13-41 at 14 (the respondent's "persistent failure to report size-based costs made the remaining information so incomplete that it could not 'serve as a reliable basis for reaching a final determination'"); Steel Auth., 25 CIT at 487, 149 F. Supp. 2d at 928 (total AFA was appropriate where respondent provided "flawed and unverifiable" data necessary to calculate the dumping margin).

        Koehler's insistence that Commerce could have simply applied partial AFA by plugging in Koehler's home market sales data for products other than 48-gram LWTP in place of the transshipped sales is unconvincing. As noted above, Commerce controls the dumping margin calculation, not the respondent. See Steel Auth., 25 CIT at 487, 149 F. Supp. 2d at 928. Commerce could not determine the dumping margin without complete and reliable sales data and, therefore, reasonably declined to use the selectively submitted information of an uncooperative respondent. Id., 149 F. Supp. 2d at 928.

And, contrary to Koehler's claims, the relative egregiousness of Koehler's conduct does not distinguish this case. Koehler insists that Commerce erroneously compared the instant case to those in which parties destroyed, hid, and forged documents, or repeatedly submitted false documents. See Pl.'s Reply Br. at 5-8. Koehler contends that, in contrast to those cases, it "engaged in consistent efforts to provide accurate information to Commerce." Id. at 8. But this argument is unavailing because it does not alter the fact that Koehler concealed sales information from Commerce that was essential to calculating the dumping margin. SQR at 1-4. That other companies engaged in conduct that was possibly more egregious does not undermine Commerce's decision. Commerce determined that it could not calculate the dumping margin based on Koehler's data and, therefore, reasonably applied total AFA. Steel Auth., 25 CIT at 487, 149 F. Supp. 2d at 928.

**IV. Commerce properly selected and corroborated the AFA rate.**

The final issue before the court concerns Commerce's selection of the petition rate as the AFA rate. A margin based upon AFA must be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). "[A]lthough a higher AFA rate creates a

stronger deterrent, Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin." Gallant Ocean (Thai.) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citing de Cecco, 216 F.3d at 1032). "Commerce must select secondary information that has some grounding in commercial reality." Id. at 1324.

These standards grow out of 19 U.S.C. § 1677e(c), which provides that when Commerce relies on secondary information, it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). To corroborate secondary information, Commerce must find that it has "probative value." KYD, Inc. v. United States, 607 F.3d 760, 765 (Fed. Cir. 2010). Secondary information has "probative value" if it is both reliable and relevant to the respondent. Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007).

First, Koehler challenges Commerce's use of the petition rate. See Pl.'s Mem. at 44-47. Koehler insists that petition rates are "inherently unreliable," and that the 75.36% figure has been "discredited" by individual rates Commerce assigned Koehler during the investigation and subsequent reviews. Id. at 44-45. Koehler adds that the petition rate does not reflect commercial reality because it was over eleven times higher than Koehler's previous highest margin, based on another company's information,

and derived from a constructed value methodology.  Id. at 45-47.
These arguments are unavailing, however, because Commerce is
expressly permitted by statute to rely on secondary information
such as the petition rate when applying AFA.  See 19 U.S.C. §
1677e(b); Hubscher Ribbon Corp. v. United States, 38 CIT __, __,
979 F. Supp. 2d 1360, 1369 (2014) ("Although courts are generally
suspicious of petition rates, . . . Congress has not foreclosed
their use.").  Commerce's reliance on the petition rate is proper
insofar as it establishes the commercial reality of that rate with
adequate corroboration.  19 U.S.C. § 1677e(c).

Furthermore, Koehler's previous margins are not
indicative of its commercial reality during AR3 and are, in fact,
inadequate for the purpose of establishing Koehler's AFA rate.
Koehler cooperated during the investigation and the first review,
but during AR3 Koehler concealed sales that would have resulted in
a higher normal value and, accordingly, a higher dumping margin.
SQR at 1-4.  Accordingly, it was reasonable for Commerce to reject
the established rates and instead select a rate which accounted
for this conduct along with a "built-in increase" for deterrence
purposes.  See de Cecco, 216 F.3d at 1032.

Turning to Commerce's corroboration exercise, Commerce
relied upon transaction-specific margins for Koehler's sales
during the second administrative review ("AR2").  See PR 99 at 18.
Although it noted that sources of corroboration were limited,

Commerce found that the transaction-specific margins reflected commercial reality because they were based upon Koehler's actual sales data from the previous period of review. See PR 176 at 18-19. And, because the petition rate "fell within the range" of these transaction-specific margins, which stretched as high as 144.625%, Commerce found that the petition rate was probative of Koehler's commercial reality. Id. at 19. Commerce acknowledged that the 144.625% margin was the only margin above the petition rate, but continued to rely on the data because: (1) the petition rate was significantly lower than the 144.625% margin; (2) the transaction-specific margins did not account for the sales Koehler transshipped during AR2, which would have increased the margins; and (3) the CAFC found that Commerce may rely on a respondent's transaction-specific margins as corroboration even if only a small percentage exceed the AFA rate. See id. at 19-20.

Koehler insists that this was inadequate because Commerce solely relied on the single transaction-specific margin above the petition rate out of the [[    ]] observations during AR2, roughly [[   ]]% of all observations. Pl.'s Mem. at 49-50. It compares this case to Gallant Ocean, noting that corroboration was improper there "because Commerce did not identify any relationship between the small number of unusually high dumping transactions with Gallant's actual rate." Id. at 52 (citing Gallant Ocean, 602 F.3d at 1324). Koehler also argues that

Commerce's reliance on the 144.625% margin was unreasonable because the sale was actually an "error," as demonstrated by the low quantity and price.[8]  Id. at 51.

The court finds that Commerce adequately corroborated the petition rate. Here, Commerce tied the petition rate to Koehler's commercial reality using Koehler's actual sales data. CR 99 at 19; cf. Gallant Ocean, 602 F.3d at 1324 (Commerce failed to connect Gallant's commercial reality to a small amount of data sourced from other respondents during a different proceeding). Although only one sale from AR2 produced a margin above the petition rate, that sale established an upper-limit for the range of transaction-specific margins in which the petition rate fell. See PAM, S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009) (finding that Commerce's corroboration analysis was reasonable even though only 0.5% of the transactions produced

---

[8] Koehler also argues that Commerce cannot rely on Koehler's AR2 data because it found that data to be unreliable and applied total AFA during the remand of AR2.  Notice of Supplemental Authority at 1-3 (July 2, 2014), ECF No. 109.  According to Koehler, "Commerce cannot have it both ways," the data cannot be both reliable and unreliable.  Id. at 3.  However, the remand results of AR2 are not on the record of AR3.  See QVD Food Co. v. United States, 658 F.3d 1318, 1324-25 (Fed. Cir. 2011) ("Judicial review of antidumping duty administrative proceedings is normally limited to the record before the agency in the particular review proceeding at issue and does not extend to subsequent proceedings.").  Moreover, that Commerce found Koehler's data to be unreliable for the purpose of calculating a weighted average dumping margin does not affect its use of transaction-specific margins from that data for the separate purpose of corroborating an AFA rate.

margins exceeding the AFA rate).  Courts have questioned Commerce's ability to establish a respondent's commercial reality with a small amount of data, see Dongguan Sunrise Furniture Co. v. United States, 37 CIT __, __, 931 F. Supp. 2d 1346, 1356 (2013) (finding that "Commerce's reliance on minuscule percentages of sales to determine the partial AFA rates" was unreasonable); but see PAM, 582 F.3d at 1340, but the facts of this case substantially support Commerce's reliance on the transaction-specific margins.

First, as a result of Koehler's conduct, the record lacked data essential to establishing Koehler's commercial reality.  This Court has recognized that corroboration may be "less than ideal" where the sole respondent in a proceeding fails to cooperate "because the uncooperative acts of the respondent has deprived Commerce of the very information that it needs to link an AFA rate to [respondent's] commercial reality."  Hubscher, 38 CIT at __, 979 F. Supp. 2d at 1369 (quoting Qingdao Taifa Group Co. v. United States, 35 CIT __, __, 780 F. Supp. 2d 1342, 1349 (2011)).  This was certainly the case here: Koehler was the sole respondent and omitted sales data necessary to determine its commercial reality.  SQR at 1-4.  In contrast, Commerce had established rates for "over a dozen" mandatory respondents in Gallant Ocean.  See Gallant Ocean, 602 F.3d at 1324.

Furthermore, the AR2 margins are artificially low.  As Koehler admitted, it began transshipping merchandise during the

review period of AR2.  See SQR at 1-2.  Accordingly, the normal
value Commerce used to calculate the transaction-specific margins
did not include some of the highest-priced home market sales.  PR
176 at 19-20.  Although the extent to which these sales would have
raised the margins is unclear, it was reasonable for Commerce to
conclude that the actual AR2 margins exceeded those which Commerce
calculated using the data Koehler provided.  Id. at 20.

        Moreover, there is no evidence that Commerce simply
"cherry-picked" the highest margin, as Koehler insists.  Commerce
did not select the 144.625% margin as Koehler's actual AFA rate,
but instead used it to establish an upper boundary for a range of
transactions that reflected Koehler's commercial reality.  See PR
176 at 19.  And, in fact, the petition rate was well below the
144.625% margin.  See id.

        Koehler's argument that the 144.625% margin was
aberrational is also unpersuasive.  Koehler claims that there is
evidence to demonstrate this fact, but it did not request that
Commerce reopen the record for this evidence until its case brief.
See Koehler's Case Brief at 49 (Jan. 17, 2013), CR 101.  Despite
its claim that it did not have an opportunity to present any
evidence against the AR2 data until this stage, see Pl.'s Mem. at
51, the record indicates that Appvion placed the AR2 data onto the
record of AR3 in May 2012, see May 18th Letter, Exh. 35, CR 55, and
requested that Commerce use the 144.625% margin as the AFA rate in

July 2012. <u>See</u> Response to Koehler's July 16, 2012 Letter at 10–11 (July 24, 2012), CR 88. Thus, Koehler was aware that Commerce might use the AR2 data and had an opportunity to respond to Appvion's arguments earlier in the review, but failed to act.

Without any explanatory evidence concerning the sale at issue, Koehler simply argues that Commerce cannot rely on the sale because it had a lower quantity and lower price than the other U.S. sales. <u>See</u> Pl.'s Mem. at 49–51. However, Commerce reasonably determined that the numerical differences alone were insufficient to undermine the reliability of the 144.625% margin. <u>See</u> <u>PSC VSMPO -AVISMA Corp. v. United States</u>, 35 CIT __, __, 755 F. Supp. 2d 1330, 1338 & n.10 (2011), <u>aff'd</u> 498 Fed. App'x 995 (Fed. Cir. 2013) (the fact that a sale had the highest transaction-specific margin "by a wide margin" was insufficient to show that the sale was "irregular" or "aberrational"); <u>U.S. Steel Corp. v. United States</u>, 34 CIT __, __, 712 F. Supp. 2d 1330, 1342 (2010) (rejecting Plaintiff's "attempts to prove distortion simply by pointing to contrasting figures"). Accordingly, Commerce reasonably concluded that the sale was part of Koehler's commercial experience.

Ultimately, Commerce properly determined that the petition rate was a reasonably accurate estimate of Koehler's commercial reality with a "built-in increase" for deterrence purposes. <u>See</u> <u>de Cecco</u>, 216 F.3d at 1032. Although the petition

rate exceeded Koehler's previous margins,[9] it was not punitive because it was properly corroborated.  See KYD, 607 F.3d at 768 ("[A]n AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure.").  Accordingly, Commerce properly selected the AFA rate.  19 U.S.C. § 1677e(c).

## CONCLUSION

In accordance with the foregoing, the court finds that the Final Results were supported by substantial evidence and in accordance with law in their entirety.  Plaintiff's motion is denied in full.  Judgment will be entered accordingly.


/s/ Nicholas Tsoucalas
**Nicholas Tsoucalas**
**Senior Judge**

**Dated: September 3, 2014**
      **New York, New York**

---

[9] Koehler also compared the petition rate to a 2.71% margin it calculated using the data it submitted, including the rejected home market sales data.  Pl.'s Reply Br. at 32-33.  Koehler claims this data was on the record, but Commerce retained the submissions "solely for the purposes of establishing and documenting the basis for its decision for rejecting the documents."  PR 108 at 2; 19 C.F.R. § 351.104(a)(2)(ii).  Because this data was not part of the record for the Final Results, the court declines to consider the 2.71% rate.  See QVD, 658 F.3d at 1324-25.